IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:24-CR-68-D

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | **ORDER** |
| ) | |
| PARKER ALLEN GIBSON, ) | |
| ) | |
| Defendant. ) | |

On February 23, 2024, a grand jury in the Eastern District of North Carolina indicted Parker Allen Gibson ("Gibson" or "defendant") for (1) conversion of United States property in violation of 18 U.S.C. § 641, (2) theft of explosive materials in violation of 18 U.S.C. § 844(k), (3) possession of stolen explosive materials in violation of 18 U.S.C. § 842(h), (4) possession of an unregistered destructive device in violation of 26 U.S.C. § 5861(d), and (5) unauthorized removal and retention of classified documents in violation of 18 U.S.C. § 1924(a). See [D.E. 1]. On August 17, 2024, Gibson moved to suppress evidence under the Fourth Amendment and filed a memorandum in support and exhibits [D.E. 27]. On September 24, 2024, the United States responded in opposition and filed exhibits [D.E. 34]. On August 26, 2025, the court held an evidentiary hearing. Army Criminal Investigation Division ("CID") Special Agent Justin Garcia and Kelsey Gibson testified at the hearing, and the court received nine exhibits from the United States and six exhibits from defendant. As explained below, the court denies Gibson's motion to suppress.

I.

Gibson is a retired special forces soldier who served in the United States Army ("Army") for over 20 years. See [D.E. 27] 1. Gibson's ex-wife, Kelsey Gibson ("Kelsey") is an Army Chief

Warrant Officer. See [D.E. 34] 2. While married, Gibson and Kelsey lived together at their residence in Bunnlevel, North Carolina. See [D.E. 27-1] 54; [D.E. 34-7] 3. In March 2021, Gibson asked Kelsey to rent a storage unit so that Gibson could store items concerning his aerial photography business. See [D.E. 27-1] 11. On March 12, 2021, Kelsey signed a lease for a storage unit ("Unit 204") at the USA Storage Center Stockade ("USA Storage") in Cameron, North Carolina. See Gov't Ex. 3. Kelsey took possession of Unit 204, placed a lock on Unit 204's door, provided Gibson the keys, and he placed them on a key peg in their residence. See, e.g., [D.E. 27] 2; [D.E. 27-1] 25. The lease for Unit 204 does not list Gibson as a co-tenant. See Gov't Ex. 3. Kelsey completed another document concerning Unit 204 for USA storage and listed Gibson as her emergency contact. Kelsey considered Unit 204 to be their storage unit.

In May 2022, Kelsey's marriage to Gibson was rocky. See [D.E. 27-1] 39. Gibson told Kelsey that he was going on a trip to take photographs on the Appalachian Trail, but she learned that Gibson instead went to Chicago. Kelsey suspected infidelity, and she believed that Unit 204 might contain answers. On May 4, 2022, Kelsey went to Unit 204 and discovered that Gibson had placed a new lock on Unit 204. See [D.E. 27-1] 13. On the same day, Kelsey approached USA Storage staff, noted her name on the lease, and requested bolt cutters to access Unit 204. See id. After Kelsey provided identification, USA Storage staff provided bolt cutters to Kelsey and allowed Kelsey to cut off the lock and enter Unit 204. See id. Once inside, Kelsey discovered Army drones, Army green-tip 5.56 caliber ammunition, and other supplies marked with Army insignia. See [D.E. 34-2] 1–14. Kelsey believed that Gibson had stolen Army material and hidden it in Unit 204. During May 2022, Kelsey photographed numerous items in Unit 204 and placed the photographs on a Google drive. See Gov't Exs. 1, 2.

2

At the evidentiary hearing, Kelsey credibly testified that she was concerned about Gibson's apparent theft of the Army material she found in Unit 204. Due to Gibson's temper, she also was concerned about her safety and the safety of her 10-year-old daughter and 15-year-old son. Moreover, she was concerned about Army munitions and lithium batteries being stored in Unit 204, which was not climate controlled.

On June 9, 2022, Kelsey spoke with Army Sergeant Major Ashenbrenner. Ashenbrenner had served with Gibson in Gibson's former Army unit. Kelsey described what she found in Unit 204, and asked whether she could use an amnesty program to return the Army material in Unit 204 to the Army. Sergeant Major Ashenbrenner told Kelsey that he did not know but would ask Army CID and let Kelsey know. Ashenbrenner eventually spoke with Agent Garcia. After Sergeant Major Ashenbrenner spoke with Agent Garcia, Ashenbrenner told Kelsey that she could not use an amnesty program to return the Army material in Unit 204.

On June 21, 2022, at approximately 7:00 p.m., Kelsey called Agent Garcia. See [D.E. 34-1] 1. Garcia was at his son's football practice. Kelsey told Garcia that she suspected Gibson had stolen and stored Army drones, ammunition, and other unit material in Unit 204. See id.; [D.E. 27-1] 12–13. Kelsey also stated that she found lithium batteries that looked like government-issued batteries. Moreover, Kelsey shared the photographs she took in Unit 204 with Garcia. See Gov't Ex. 1, 2; [D.E. 34-1] 1; [D.E. 27-1] 14.

During the conversation on June 21, 2022, Kelsey also told Garcia that Unit 204 was rented in her name and that she consented to CID and local law enforcement searching the storage unit. See Def. Ex. 2. Kelsey described to Garcia Unit 204's content, including Army green tip 5.56 caliber ammunition, multiple Army drone units such as MK-2s USA and Ravens, additional Army ammunition in original packaging in ammunition cans, lithium batteries, and Army unit

3

memorabilia that had been for sale in Gibson's old unit office. Id. Kelsey also described additional Army ammunition that she found at their residence. Id. Kelsey also told Garcia that Unit 204 contained one metal locker that was locked and that she did not open. Kelsey told Garcia that if provided bolt cutters, she would be willing to cut the locks off the metal locker. See id. Garcia did not respond to Kelsey's comment about cutting the locks off the metal locker.

During the conversation on June 21, 2022, Garcia offered to meet Kelsey at Unit 204 that night to secure the Army items in Unit 204. See id. Kelsey declined to meet with Garcia that night because she needed to be home with her children. See id. During the conversation, Kelsey also expressed concern about her safety and the safety of her children due to domestic violence incidents with Gibson. See id. Kelsey told Garcia that she still lived with Gibson and expected him to begin moving out over the Fourth of July holiday. See id. Garcia ended the conversation by telling Kelsey that her safety and her children's safety was CID's top priority. See id. On June 21, 2022, Kelsey did not tell Garcia that she had cut the lock off Unit 204 and replaced it with her own lock.

On June 22, 2022, at about noon, Kelsey met Garcia, CID Agent Elmer Mason, who was Garcia's supervisor, and Detective Brad Byrd of the Harnett County Sheriff's Office at the USA Storage facility. Each had driven their own car to the USA Storage facility. Before entering the gated area where Unit 204 was located, Kelsey gave Garcia a copy of her USA Storage gate access code and showed Garcia a copy of the Unit 204 lease. See Gov't Exs. 3, 9; [D.E. 34-1] 1; [D.E. 27-1] 30–33. Kelsey also provided the law enforcement agents oral and written consent to search Unit 204. See Gov't Ex. 4; [D.E. 34-1] 1; [D.E. 34-4] 1; [D.E. 27-1] 33–34. Kelsey then used her gate code and led Garcia and other agents to Unit 204. Kelsey unlocked Unit 204 with her

4

key. On that date, Kelsey did not tell Garcia or the other law enforcement agents that she had cut the lock off Unit 204 and replaced it with her own lock.

Beginning at about 12:30 P.M., Garcia and the other agents searched Unit 204. Inside Unit 204, Garcia and the agents discovered various military-issue munitions and equipment. See Gov't Ex. 8; [D.E. 34-5] 1–7. During the search, Garcia took photographs. See Gov't Ex. 8.

While the agents were searching Unit 204, Kelsey sat in her car. At some point during the search, Garcia removed a locked silver footlocker and placed it outside Unit 204. See Gov't Ex. 2, at 4; Gov't Ex. 8, at 75; Def. Ex. 4. Kelsey observed the locked silver footlocker and walked to the USA Storage office, obtained bolt cutters, and returned. Kelsey then cut the locks off the locked silver footlocker. No law enforcement agent asked her to cut the locks off. Kelsey did so on her own. After Kelsey cut the locks off, agents opened the silver footlocker and discovered two classified maps, military magazines, military ammunition, two incendiary grenades, one red smoke grenade, and one electronic firing device for a claymore system. See Gov't Ex. 5, at 3 (item 22). Garcia does not recall watching Kelsey cut the locks and credibly testified that Kelsey did so without any direction from law enforcement to do so.

The agents finished searching and processing Unit 204 at approximately 7:15 p.m. See Gov't Ex. 6. Kelsey then locked Unit 204 with her key, and everyone left in their own vehicles. Garcia did not interview Kelsey until June 23, 2022. It was not until the interview on June 23, 2022, that Kelsey told Garcia that she had discovered a different lock on Unit 204 in May 2022, that she cut off that lock, and replaced the lock with a lock of her own.

On July 26, 2022, the court issued a search warrant for Gibson's residence in Bunnlevel, North Carolina. See Gov't Ex. 7; [D.E. 37-4] 1. The same day, the United States executed that

5

search warrant on Gibson's residence. In Gibson's garage, the United States recovered additional Army munitions.

II.

Gibson moves to suppress evidence all evidence recovered from Unit 204.[1] The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The "touchstone" of the analysis "under the Fourth Amendment is always the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." Pennsylvania v. Mimms, 434 U.S. 106, 108–09 (1977) (per curiam) (quotation omitted). Warrantless searches are "presumptively unreasonable." Kentucky v. King, 563 U.S. 452, 459 (2011) (quotation omitted); see, e.g., Fernandez v. California, 571 U.S. 292, 298 (2014). The Fourth Amendment, however, "does not specify when a search warrant must be obtained." King, 563 U.S. at 459. Over the past two centuries, courts have recognized "categories of permissible warrantless searches." Fernandez, 571 U.S. at 298; see King, 563 U.S. at 459; Flippo v. West Virginia, 528 U.S. 11, 13–14 (1999) (per curiam); Mimms, 434 U.S. at 108–09; Katz v. United States, 389 U.S. 347, 357 & n.19 (1967) (collecting cases). "Consent searches occupy one of these categories." Fernandez, 571 U.S. at 298.

"Consent searches are part of the standard investigatory techniques of law enforcement agencies and are a constitutionally permissible and wholly legitimate aspect of effective police activity." Id. (quotation omitted); see Schneckloth v. Bustamonte, 412 U.S. 218, 231–32 (1973). Consent searches "may be particularly important" where the owner of a property "has a strong

---

[1] On August 12, 2025, Gibson withdrew the portion of his motion to suppress concerning the items seized from the garage of the residence in Bunnlevel, North Carolina. See [D.E. 65].

6

interest in . . . [apprehending] . . . the perpetrator of a crime." Fernandez, 571 U.S. at 298. "A stranger to a property obviously cannot consent to its search." United States v. Sheckles, 996 F.3d 330, 347 (6th Cir. 2021). For consent to be valid, a consenting party must have "actual" or "apparent" authority. See Illinois v. Rodriguez, 497 U.S. 177, 187–89 (1990); United States v. Buckner, 473 F.3d 551, 554–55 (4th Cir. 2007). Consent must be "knowing and voluntary . . . based on the totality of the circumstances." Trulock v. Freeh, 275 F.3d 391, 401 (4th Cir. 2001) (quotation omitted); see United States v. Mendenhall, 446 U.S. 544, 555–60 (1980); United States v. Block, 590 F.2d 535, 539 (4th Cir. 1978).

"Consent need not be obtained from the search's ultimate target." United States v. Perry, 92 F.4th 500, 512 (4th Cir. 2024), cert. denied, 144 S. Ct. 2643 (2024). When more than one person has authority over a property, "the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." United States v. Matlock, 415 U.S. 164, 170 (1974); see Fernandez, 571 U.S. at 299–300. "Common authority in this context is not merely a question of property interest . . . . [I]t requires evidence of mutual use by one generally having joint access or control for most purposes." Buckner, 473 F.3d at 554 (quotation omitted); see Trulock, 275 F.3d at 403. "Although common authority over a general area confers actual authority to consent to a search of that general area, it does not automatically extend to the interiors of every discrete enclosed space capable of search within the area." Buckner, 473 F.3d at 554 (cleaned up); see Block, 590 F.2d at 541 & n.8. Consent by common authority is reasonable because any co-owners "assume[] the risk that one of their number might permit the common effects to be searched." Buckner, 473 F.3d at 554 (cleaned up); see Matlock, 415 U.S. at 171. Indeed, "it is well settled that [consent] may be based simply upon the fact that the third person shares with the absent target of the search a common authority

7

over, general access to, or mutual use of the place or object sought to be inspected." Block, 590 F.2d at 539.

A party may limit the scope of "the search to which [s]he consents." Florida v. Jimeno, 500 U.S. 248, 252 (1991). If the consent, however, "would reasonably be understood to extend to a particular container, the Fourth Amendment provides no grounds for requiring a more explicit authorization." Id.; see United States v. Ortiz, 669 F.3d 439, 448 (4th Cir. 2012); United States v. Coleman, 588 F.3d 816, 820 (4th Cir. 2009); United States v. Jones, 356 F.3d 529, 534 (4th Cir. 2004); United States v. Poole, 829 F.2d 37, 1987 WL 44671, at *3–4 (4th Cir. 1987) (per curiam) (unpublished table decision).

A consent search is also valid when the consenting party has "apparent authority." Buckner, 473 F.3d at 555. Apparent authority exists when an officer reasonably believes that the consenting party has sufficient authority to consent to search the property. See Rodriguez, 497 U.S. at 187–88; Buckner, 473 F.3d at 555. To determine if apparent authority exists, the court examines if "the facts available to the officer at the moment [would] warrant a man of reasonable caution in the belief that the consenting party had authority over the premises." Rodriguez, 497 U.S. at 188 (cleaned up); see Terry v. Ohio, 392 U.S. 1, 21–22 (1968).

Gibson admits that Kelsey knowingly and voluntarily consented to a search of Unit 204. See [D.E. 27] 3–7. Gibson argues, however, that Kelsey lacked actual or apparent authority to consent to a search of Unit 204 and its contents. See id.

Kelsey had actual authority to consent to a search of Unit 204. The lease for Unit 204 lists Kelsey as the only tenant. See Gov't Ex. 3; [D.E. 34-3] 2; [D.E. 27] 2; [D.E. 27-1] 25. As a tenant, Kelsey had the right to enter Unit 204, which she exercised when she entered Unit 204 in May 2022 and installed a new lock in May 2022. See Gov't Ex. 3; [D.E. 34-3] 1–2; [D.E. 27-1] 13.

8

Moreover, Kelsey's lock remained on Unit 204 through June 22, 2022. Furthermore, "a party has actual authority to consent to a storage-unit search when the party has a right to enter the unit under the terms of the rental agreement with the storage facility." Sheckles, 996 F.3d at 348; see United States v. Smith, 353 F. App'x 229, 230–31 (11th Cir. 2009) (per curiam) (unpublished); United States v. Trotter, 483 F.3d 694, 699 (10th Cir. 2007), vacated on other grounds, 552 U.S. 1090 (2008); United States v. Camp, 157 F. App'x 121, 122–24 (11th Cir. 2005) (per curiam) (unpublished); United States v. Kim, 105 F.3d 1579, 1582 (9th Cir. 1997); United States v. Warren, 18 F.3d 602, 603–04 (8th Cir. 1994). Thus, on June 22, 2022, Kelsey had actual authority to consent to the search of Unit 204.

Alternatively, on June 22, 2022, Kelsey had common authority over Unit 204. By asking Kelsey to lease a storage unit rather than lease one himself, Gibson "assumed the risk that [Kelsey] would allow someone else to look inside." Matlock, 415 U.S. at 171; see Block, 590 F.2d at 539; Buckner, 473 F.3d at 554.

In opposition, Gibson cites Buckner, a computer search case. See [D.E. 27] 4. In Buckner, the United States Court of Appeals for the Fourth Circuit analyzed a warrantless search of specific locked files on a computer, not access to the computer itself. See Buckner, 473 F.3d at 553–54. Unlike in Buckner, Kelsey considered Unit 204 to be a storage unit for herself and Gibson, and she had "access or control" over Unit 204 and its contents because she was the only tenant on the lease and had her lock on Unit 204 from May 2022 through most of June 2022, including on June 22, 2022. Buckner, 473 F.3d at 554.

Consent "may be based simply upon the fact that the third person shares with the absent target of the search a common authority over . . . the place or object sought to be inspected." Block, 590 F.2d at 539. Kelsey had common authority over Unit 204 and its contents due to her rental

agreement. See Matlock, 415 U.S. at 170–71; Buckner, 473 F.3d at 554; Block, 590 F.2d at 539–40. From May 2022 through June 22, 2022, Kelsey "had at least joint, if not sole, access and control over" Unit 204, including "at the time of the search." Perry, 92 F.4th at 512. Furthermore, on June 22, 2022, law enforcement agents searched Unit 204 only after Kelsey had entered, searched, and photographed Unit 204, and secured Unit 204 with her own lock. See [D.E. 34-1] 1; [D.E. 34-4] 1. Kelsey took each step without law enforcement prompting or engagement. Moreover, on June 22, 2022, when law enforcement agents searched Unit 204, Kelsey consented and had common authority to consent to the search of Unit 204 and its contents. See, e.g., Camp, 157 F. App'x at 123 & n.2; Buckner 473 F.3d at 554; Block, 590 F.2d at 539–40; United States v. Manafort, 323 F. Supp. 3d 768, 775–78 (E.D. Va. 2018) ("Manafort II"); United States v. Manafort, 313 F. Supp. 3d 213, 220–28 (D.D.C. 2018) ("Manafort I").

Alternatively, on June 22, 2022, Kelsey had apparent authority to consent to the search of Unit 204 and its contents. Throughout Kelsey's communications with Garcia and law enforcement agents before the search on June 22, 2022, Kelsey stated that Unit 204 was "her storage unit." [D.E. 34-1] 1. Before the search on June 22, 2022, Kelsey had shared photographs with Garcia of containers inside Unit 204 with Army munitions and equipment. See id.; Gov't Ex. 2; [D.E. 27-1] 14. Moreover, before law enforcement agents searched Unit 204, Kelsey met Garcia and two other agents met at the USA Storage facility, and she gave Garcia a copy of her USA Storage gate access code. See [D.E. 34-1] 1; [D.E. 27-1] 30. Kelsey also showed Garcia a copy of the Unit 204 lease that listed Kelsey as the only tenant. See id.; [D.E. 34-3] 1–3; [D.E. 34-4] 1; [D.E. 27-1] 33–34. Kelsey also provided oral and written consent to search Unit 204. See Gov't Ex. 4. Kelsey then led Garcia and the other two agents to Unit 204 and unlocked the unit with her key. Thus, on June 22, 2022, a reasonable officer would believe that Kelsey had apparent authority to

10

consent to search Unit 204 and its contents. See, e.g., Rodriguez, 497 U.S. at 188; Buckner, 473 F.3d at 555–56; Camp, 157 F. App'x at 123 & n.2; Manafort II, 323 F. Supp. 3d at 778–80; Manafort I, 313 F. Supp. 3d at 220–28.

Finally, Gibson argues that even if Kelsey permissibly consented to a search of Unit 204, she could not consent to search the containers inside Unit 204, including particularly the locked silver footlocker. See [D.E. 27] 5–7. In support, Gibson cites Block and argues that consent to search a general area "cannot be thought automatically to extend to the interiors of every discrete enclosed space capable of search within the area." Block, 590 F.2d at 541.

In Block, a mother expressly consented to a search of her son's room in the mother's house but expressly "asserted [her son's] claim of privacy over [a footlocker in his room] and disclaimed for herself any shared right of access to it." Id. at 541. Unlike in Block, Kelsey did not assert Gibson's privacy over the containers inside Unit 204 and did not disclaim any shared right of access to such containers, including the locked silver footlocker. Moreover, "Block never established a per se rule that third parties lack authority to consent to the search of any locked object." Poole, 1987 WL 44671, at *3. Thus, Block does not help Gibson.

On June 22, 2022, law enforcement agents reasonably believed that Kelsey gave them her general and unqualified consent to search Unit 204 and all its contents. She wanted the agents to recover any items belonging to the Army in Unit 204. When a party "gives [her] general and unqualified consent for an officer to search a particular area, the officer does not need to return to ask for fresh consent to search a closed container located within that area." Jones, 356 F.3d at 534; see Jimeno, 500 U.S. at 252; Ortiz, 669 F.3d at 447–48; Coleman, 588 F.3d at 820. Kelsey's general and unqualified consent extended to the lockers and containers inside Unit 204 because, as Kelsey's photographs demonstrated to the law enforcement agents, the Army munitions and

11

property were in containers of all sizes. See Gov't Ex. 2; [D.E. 34-2] 1–14. The law enforcement agents reasonably understood Kelsey's consent, whether actual or apparent, to search Unit 204 for allegedly stolen military munitions and property in any container that could conceal such munitions and property. See Jimeno, 500 U.S. at 252; Ortiz, 669 F.3d at 447–48; Coleman, 588 F.3d at 820; Jones, 356 F.3d at 534; United States v. Foster, 654 F. Supp. 2d 389, 399 (E.D.N.C. 2009). The search of Unit 204 and the containers within Unit 204 did not violate the Fourth Amendment. Thus, the court denies Gibson's motion to suppress. In light of this conclusion, the court does not address the government's inevitable-discovery argument. See, e.g., Murray v. United States, 487 U.S. 533, 540–44 (1988); Nix v. Williams, 467 U.S. 431, 440–50 (1984); United States v. Alston, 941 F.3d 132, 138–40 (4th Cir. 2019); United States v. Bullette, 854 F.3d 261, 264–67 (4th Cir. 2017).

III.

In sum, the court DENIES defendant's motion to suppress [D.E. 27]. The parties SHALL meet and confer about proposed trial dates. Any intervening period of time is excluded under the Speedy Trial Act in order to permit the parties to prepare for trial. The court finds that the ends of justice served by granting this extension outweigh the best interests of the public and the defendant in a speedy trial. The court excludes the period of delay necessitated by this extension from speedy trial computation pursuant to 18 U.S.C. § 3161(h).

SO ORDERED. This _11_ day of September, 2025.

JAMES C. DEVER III
United States District Judge